## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Omar Kwabena Walford,            Case No. 20-cv-1637 (SRN/TNL)

        Petitioner,

v.                 **REPORT & RECOMMENDATION**

Warden Guy Bosch,

        Respondent.

Omar Kwabena Walford, OID# 204538, MCF Stillwater, 970 Pickett Street North, Bayport, MN 55003 (pro se Petitioner); and

Jeffrey Wald, Assistant Ramsey County Attorney, 345 Wabasha Street North, St. Paul, MN 55102 (for Respondent).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on pro se Petitioner Omar Kwabena Walford's Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, ECF No. 1. Petitioner is proceeding pro se. Respondent Warden Guy Bosch is represented by Assistant Ramsey County Attorney Jeffrey Wald.

This action has been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that the Petition be denied and this action be dismissed with prejudice.

## II. BACKGROUND

In 2015, Petitioner was charged with four counts of assault. *State v. Walford*, No. A18-1904, 2019 WL 4745370, at *1 (Minn. Ct. App. Sept. 30, 2019) [hereinafter *Walford III*], *rev. denied* (Minn. Dec. 17, 2019); *see generally State v. Walford*, No. 62-CR-15-4027 (Minn. Dist. Ct.) [hereinafter *Walford*].

### A. Trial: *Walford*

Petitioner's trial was scheduled for December 2015. *Walford III*, 2019 WL 4745370, at *1; Resp't's App. at 9-10,[1] ECF No. 10-1; Pet'r's Br. at 2, ECF No. 7. The trial was continued, however, "several times, for reasons including scheduling conflicts, to provide [Petitioner's] public defender an opportunity to gather more evidence, and because [Petitioner's] public defender was on medical leave for a period of time." *Walford III*, 2019 WL 4745370, at *1; *see* Resp't's App. at 10; Pet'r's Br. at 2. On January 17, 2017, Petitioner

> requested to discharge the office of the public defender and proceed pro se. [Petitioner] told the [trial] court that there was a breakdown in his relationship with his public defender that could not be repaired. [Petitioner] acknowledged that another attorney would not be appointed for him. The [trial] court accepted [Petitioner's] petition to proceed pro se and discharged the office of the public defender.

*Walford III*, 2019 WL 4745370, at *1; *see* Resp't's App. at 10, 14-15; Pet'r's Br. at 3, 8-9; *see generally* Resp't's App. at 46-62 (Jan. 17, 2017 hearing transcript), 64-67 (petition to proceed pro se).

---

[1] The Court cites to the Bates-stamped pages of Respondent's Appendix, which are consecutively paginated.

Approximately three weeks later, on February 9[2], 2017, the trial court appointed advisory counsel for Petitioner. Resp't's App. at 68-69; *see* Resp't's App. at 15; Pet'r's Br. at 10. The order indicated that advisory counsel "was not required to be prepared to assume full representation of [Petitioner]." Resp't's App. at 15; *accord* Pet'r's Br. at 10; *see* Resp't's App. at 68 ("The defendant retains the right to decide when and how to use advisory counsel; decisions about the use of advisory counsel may affect a later request by the defendant to allow advisory counsel to assume full representation.").

Petitioner proceeded to a bench trial and was found guilty on three of the four counts. *Walford III*, 2019 WL 4745370, at *1; Resp't's App. at 11; Pet'r's Br. at 3. Petitioner was sentenced to prison and appealed to the Minnesota Court of Appeals. *Walford III*, 2019 WL 4745370, at *1; Resp't's App. at 11; Pet'r's Br. at 3, 10.

## B. First Appeal: *Walford II*

On appeal, Petitioner argued that the trial court erred by denying his request for substitute counsel and accepting his waiver of counsel where the request was timely and supported by exceptional circumstances. Resp't's App. at 77.

### 1. Arguments on Appeal

Petitioner's arguments were premised on his right to assistance of counsel under the federal Constitution, referencing, among other authorities, the Sixth and Fourteenth Amendments; the state's obligation to provide counsel for indigent defendants, citing *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963); and the attachment of the Sixth

---

[2] The order is dated February 9 but appears to have been docketed on February 10, 2017. *Walford*, No. 62-CR-15-4027 (Minn. Dist. Ct. Feb. 9, 2017) (Index #65).

Amendment's right to counsel at "critical stages of a criminal prosecution," citing *United States v. Wade*, 388 U.S. 218, 224-25 (1967). Resp't's App. at 86-87; *see also* Resp't's App. at 72.

Among other things, Petitioner argued that his waiver of counsel was not voluntary because the "decision to waive counsel rested on the false premise that the [trial] court could not appoint substitute counsel." Resp't's App. at 91. Petitioner also argued that absence of an inquiry into his complaints regarding his public defender "preclude[d] a finding that [his] waiver of his Sixth Amendment right to counsel . . . was voluntarily made." Resp't's App. at 92. In support of these arguments, Petitioner cited to federal case law from the Third and Eighth Circuit Courts of Appeal regarding the Sixth Amendment right to counsel and the waiver of such right. Resp't's App. at 91-92; *see also* Resp't's App. at 72. *See Pazden v. Maurer*, 424 F.3d 303, 312-14 (3d Cir. 2005); *Gilbert v. Lockhart*, 930 F.2d 1356, 158-60 (8th Cir. 1991).

Petitioner also cited to, for example, *State v. Fagerstrom*, 176 N.W.2d 261 (Minn. 1970), *State v. Worthy*, 583 N.W.2d 270 (Minn. 1998), and *State v. Munt*, 831 N.W.2d 569 (Minn. 2013), which discussed a federal constitutional right to counsel. *See, e.g.*, Resp't's App. at 86-89; *see also* Resp't's App. at 72. He also cited to *State v. Gillam*, 629 N.W.2d 440 (Minn. 2001), which discussed standards for appointment of substitute counsel under state law and Eighth Circuit precedent in the context of a Sixth-Amendment challenge. Resp't's App. at 86; *see also* Resp't's App. at 72.

In addition, Petitioner argued that he was entitled to a new trial because he was denied his Sixth Amendment right to counsel at a critical stage of the prosecution, including

a pretrial hearing in which he waived his right to a jury trial and motions in limine were argued as well as opening statements. In support of this argument, Petitioner cited, among other authorities, the Supreme Court's decisions in *Wade* and *Rothgery v. Gillespie County*, 554 U.S. 191 (2008), and the Eighth Circuit's decision in *Hanson v. Passer*, 13 F.3d 275 (8th Cir. 1994). *See* Resp't's App. at 92-93; *see also* Resp't's App. at 72-73.

### 2. *Walford II* Order Opinion

"In an order opinion, [the Minnesota Court of Appeals] concluded that the [trial] court abused its discretion by failing to determine if [Petitioner's] allegations concerning an irreparable breakdown in his relationship with his public defender were true and serious enough to justify the appointment of substitute counsel." *Walford III*, 2019 WL 4745370, at *1 (citing *State v. Walford*, No. A17-1396, slip op. at *5 (Minn. Ct. App. July 31, 2018) [hereinafter *Walford II*]); *accord* Resp't's App. at 99. The Minnesota Court of Appeals "remanded the case to the [trial] court with 'directions to conduct an inquiry into [Petitioner's] statement that there was an irreparable breakdown in the attorney-client relationship.'" *Walford III*, 2019 WL 4745370, at *1 (quoting *Walford II*, slip op. at *7); *accord* Resp't's App. at 101; *see* Resp't's App. at 3; Pet'r's Br. at 4. The Minnesota Court of Appeals

> explained that, if the [trial] court finds that there was not an irreparable breakdown in the attorney-client relationship that affected the public defender's ability or competence to represent [Petitioner], then [Petitioner's] waiver of counsel was voluntary and his conviction stands. [*Walford II*, slip op.] at *7-8. But if the [trial] court finds that there was an irreparable breakdown in the attorney-client relationship that affected the public defender's ability or competence to represent [Petitioner], the district court should determine

5

whether [Petitioner] is entitled to a new trial. *Id.* at *8.

*Walford III*, 2019 WL 4745370, at *1; *accord* Resp't's App. at 101-02.

## C. Evidentiary Hearing

On remand, the trial court held an evidentiary hearing. *Walford III*, 2019 WL 4745370, at *1; *see* Resp't's App. at 11; Pet'r's Br. at 4; *see generally* Resp't's App. at 103-180 (Oct. 22, 2018 hearing transcript). At the evidentiary hearing, Petitioner "testified concerning the claimed breakdown in the attorney-client relationship." *Walford III*, 2019 WL 4745370, at *1; *see, e.g.*, Resp't's App. at 16-19; Resp't's Br. at 11-15.

Petitioner began by testifying that he first met with the public defender at her office to discuss his case after he had been arraigned. Resp't's App. at 112-14, 116. Petitioner viewed a video of "discovery evidence" and provided the public defender with information on potential witnesses and a possible alibi. Resp't's App. at 113-14, 116-18. Petitioner testified that, roughly three weeks later, at the next court date, the public defender sought a continuance to look into these things further. Resp't's App. at 113; *see* Resp't's App. at 114. Petitioner testified that there "was way more than enough time for [the public defender] to have gotten the information she needed to know in order to be ready for court that day and avoid having a continuance." Resp't's App. at 113. After this initial meeting, Petitioner testified that he "never met [with the public defender] again," but would only see her "briefly before court appearances." Resp't's App. at 118.

Petitioner testified that "the beginning of the end of the trust level" occurred around February 2016. Resp't's App. at 119. Petitioner testified that the public defender explained to him that he was "facing 129 months" if he went to trial and lost. Resp't's App. at 119.

Petitioner testified that the public defender told him that, if found guilty, he would receive "a consecutive sentence for each victim," "get 60 months for each victim consecutively." Resp't's App. at 119; *see also* Resp't's App. at 120, 144. Petitioner also testified that, "at that time, [he] had no other pending charges." Resp't's App. at 119. Petitioner further testified that he distinctly remembered this because his wife told him afterwards that, if he were convicted, she would not "stick around for 129 months." Resp't's App. at 120. When the trial court asked if this amount was for "all of the possible pending cases" or "just for this case," Petitioner testified that, "[a]t that time, . . . [he] only had one charge." Resp't's App. at 120.

Petitioner also testified that, during the relevant period, he "got into a difference" with his wife that led to the police becoming involved. Resp't's App. at 124. Petitioner testified that he was arrested for violating an order of protection and terroristic threats. Resp't's App. at 124. The public defender also represented Petitioner in that case. Resp't's App. at 124.

Between August and September 2016, Petitioner was in custody; the public defender and an investigator came to see him and discuss the two cases. Resp't's App. at 125-26. Petitioner testified that this visit "was probably the longest time" the three of them spent together. Resp't's App. at 125. In November, Petitioner was surprised that the public defender did not appear at a hearing; rather, a supervising attorney appeared and the proceedings were continued. *See* Resp't's App. at 127-28.

In or around December 2016, Petitioner was charged with arson in the same county where he was already being represented by the public defender on two other cases. Resp't's

7

App. at 128.  While being arraigned, Petitioner "was told that [he] did not qualify for a public defender when [he] already had a public defender representing [him] on two cases already."  Resp't's App. at 128.  Afterwards, Petitioner contacted his public defender and explained what happened.  Resp't's App. at 128.  Petitioner testified that he expected the public defender "would have [him] put on a docket for the next day or two," but that did not happen.  Resp't's App. at 129.  Petitioner additionally testified that he asked the public defender to contact two other counties regarding pending matters he had pending, which she did.  Resp't's App. at 129-30.

Petitioner testified that "things blew out of control" when the public defender came to see him in jail on the arson charge in December.  Resp't's App. at 131, 132.  Petitioner testified that he "was upset" and "felt like it was the end of the world."  Resp't's App. at 131.  Petitioner was dealing with multiple charges and worried about "losing [his] family."  Resp't's App. at 131.  Petitioner testified that the public defender was again accompanied by the investigator and Petitioner "was concerned on why this is like the second or third time that [the public defender had] come to see [him] with th[e] investigator" but no progress had been made with regards to the defense strategies and "things that we talked about."  Resp't's App. at 132.  While the public defender investigated and pursued some of the information and talked with some of the individuals Petitioner identified, there were other things and other people she did not investigate and pursue.  Resp't's App. at 132-34, 135-36, 139-43, 155-56.

Petitioner asked the public defender and the investigator why a witness list had not been provided to the trial court and what had been done to investigate his case.  Resp't's

App. at 134. Petitioner testified that the public defender "couldn't answer the question." Resp't's App. at 134. Petitioner asked again and the response was the same. Resp't's App. at 134. Petitioner testified that he then turned to the investigator and asked him directly what had been done on his case. Resp't's App. at 134. Petitioner testified that the investigator also "couldn't answer [him]" and, "at the same time, [the public defender] started trying to answer [Petitioner's] questions." Resp't's App. at 134. Petitioner then gestured by putting his hand up towards the public defender and said, "I'm not talking to you." Resp't's App. at 134. At the hearing, Petitioner testified that he meant he was not speaking to the public defender "[j]ust at that moment," not that he was telling her that he would not speak to her again. Resp't's App. at 153. The public defender "packed up all her stuff," told Petitioner that he was "not going to treat [her] that way," and "left." Resp't's App. at 134-35. Petitioner testified that "we accomplished nothing after that" and the public defender "turned her back on [him]." Resp't's App. at 134-35.

At the evidentiary hearing, Petitioner admitted that he was upset and that his "anger might have frightened [the public defender]." Resp't's App. at 134. Petitioner testified, however, that he never told the public defender that he was not going to talk to her. Resp't's App. at 136-137. Petitioner testified that, after the December meeting, he was anxious about his relationship with the public defender. Resp't's App. at 137. Petitioner testified that he "felt like [he] couldn't express to her how [he] was feeling about the work that she was doing on the case." Resp't's App. at 137. Petitioner was also concerned that, if the public defender "fe[lt] threatened by [him]," the public defender might "get [him] charged with terroristic threats." Resp't's App. at 137; *see also* Resp't's App. at 152. This put

9

Petitioner on edge and he was "stand-offish."  Resp't's App. at 137.  Petitioner testified that he did not contact the public defender after that day and they did not speak about the case again.  Resp't's App. at 138, 153.  Petitioner also testified that the public defender "got involved in too many discussions" and "never gave [him] a chance to speak to the investigator man to man."  Resp't's App. at 144.

On January 17, 2017, the day of trial, the supervising attorney met Petitioner at the courthouse.  Resp't's App. at 137-38, 151.  The supervising attorney asked what was "going on" between Petitioner and the public defender.  Resp't's App. at 138; *see also* Resp't's App. at 151.  Petitioner was taken back and nervous as he had not contacted the supervising attorney.  Resp't's App. at 138.  Petitioner apologized and asked the supervising attorney to tell the public defender that he "apologizes for [his] behavior." Resp't's App. at 138.  Petitioner asked the supervising attorney if she herself could represent him or find him another attorney.  Resp't's App. at 138, 151.  The supervising attorney told Petitioner that decision would be made by the judge.  Resp't's App. at 138.

The supervising attorney then told Petitioner that he and the public defender were "having an irreparable breakdown in [their] relationship."  Resp't's App. at 139.  Petitioner agreed, and said that he did not "want to deal with a person that [he could not] express [himself] to" and that he was "afraid of."  Resp't's App. at 139; *see also* Resp't's App. at 152.  Petitioner testified that he told the supervising attorney that he "wasn't comfortable dealing with [the public defender]" anymore and that "she [had] lied to [him]."  Resp't's App. at 143; *see also* Resp't's App. at 151-52.

During cross-examination at the evidentiary hearing, the prosecutor asked Petitioner

10

about other matters he had pending at the time and the nature of any representation. Resp't's App. at 157-58. Petitioner responded that he had cases pending in "[e]very county in the metro area" and had been appointed a public defender in those cases, but ultimately ended up representing himself. Resp't's App. at 157-58. When pressed further about whether he had fired his "appointed public defender on multiple occasions," Petitioner testified that he never fired a public defender and that this public defender had "left [him]." Resp't's App. at 159-60.

Following the evidentiary hearing and oral argument from counsel, the trial court issued an oral ruling on the record. *See* Resp't's App. at 161-80. The trial court "found that there was not an irreparable breakdown of the attorney-client relationship." *Walford III*, 2019 WL 4745370, at *3; *see also* Resp't's App. at 179. Rather, the trial court found that "there was personal tension and deep dissatisfaction with [Petitioner's] public defender," noting that it was "hard . . . to imagine what [Petitioner's] public defender could have done in terms of her professional obligations to [Petitioner] to remedy them to [Petitioner's] satisfaction." *Walford III*, 2019 WL 4745370, at *3 (quotation omitted); *see also* Resp't's App. at 179.

When "analyzing whether the public defender's ability and competence was affected by her relationship with [Petitioner]" and the existence of exceptional circumstances, "the [trial] court identified two major issues that [Petitioner] raised: 'One, she lied to him. Two, he was fearful of her.'" *Walford III*, 2019 WL 4745370, at *3; *see also* Resp't's App. at 177.

Concerning the first issue, the [trial] court found that

11

[Petitioner's] testimony that his public defender lied about the sentence he faced was insufficiently supported because there was no transcript or record of his public defender telling him that his maximum sentence was somewhere around 110 months. The [trial] court found that, while [Petitioner] may have disbelieved or disagreed with the possible sentence, his public defender did not lie about the sentence. The [trial] court explained that there was also no indication in the record concerning whether the attorney's estimate of [Petitioner's] possible exposure was limited to just this case. The [trial] court concluded that any misunderstanding between [Petitioner] and his public defender did not rise to the level that the public defender was either not competent or not able to represent [Petitioner].

As to the second issue, the [trial] court understood [Petitioner's] fear as arising from two circumstances: first, that [Petitioner] was concerned that his public defender could somehow use an order for protection in a different case against him, and second, that [Petitioner] was dissatisfied with his public defender's use of an investigator when meeting with him. The [trial] court stated, "If the concern is an order for protection, the Court finds that a little far-fetched. If the concern is that [his public defender] would make up an accusation against [Petitioner], then the use of a third[-]party witness seems to be kind of the best practice." It concluded that [Petitioner's] concern was not "terribly credible" but, "more importantly, it doesn't rise to the level that [Petitioner and his public defender] had an irreparable breakdown in their communication."

*Walford III*, 2019 WL 4745370, at *3 (footnote omitted); *see also* Resp't's App. at 177-79. Ultimately, the trial court "found that [Petitioner] gave a voluntary, knowing, and intelligent waiver of his right to counsel and voluntarily chose to represent himself." *Walford III*, 2019 WL 4745370, at *3; Resp't's App. at 179-80.

### D. Second Appeal: *Walford* III

Petitioner appealed again to the Minnesota Court of Appeals, asserting the trial court

"erred in determining that he was not entitled to the appointment of substitute counsel." *Walford III*, 2019 WL 4745370, at *4.

### 1.  Arguments on Appeal

Petitioner challenged the trial court's findings with respect to the absence of exceptional circumstances, arguing, among other things, "that his unrebutted testimony at the evidentiary hearing established that there was a breakdown in the attorney-client relationship that affected his public defender's ability to represent him."  *Id.*; *see* Resp't's App. at 23-29.  Additionally, Petitioner again argued that the waiver of his right to counsel was not voluntary and he had been denied counsel at a critical stage of the prosecution. Resp't's App. at 30-35.

Like his first appeal, *see supra* Section II.B.1, these arguments were again premised on the right to counsel under the federal Constitution, the state's obligation to provide counsel for indigent defendants, and the attachment of the Sixth Amendment's right to counsel at critical stages of a criminal prosecution.  Resp't's App. at 23, 30.  Among other authorities, Petitioner continued to rely on the Supreme Court's decisions in *Gideon*, *Wade*, and *Rothgery*; the federal appellate court decisions of *Pazden*, *Gilbert*, and *Hanson*; and the Minnesota Supreme Court's decisions in *Fagerstrom*, *Gillam*, *Munt*, and *Worthy*.  *See, e.g.*, Resp't's App. at 23, 26-27, 29-33; *see also* Resp't's App. at 7-8.

### 2.  *Walford III* Decision

The Minnesota Court of Appeals summarized extensively Petitioner's testimony at the evidentiary hearing.  The Minnesota Court of Appeals described how Petitioner had given the public defender information early on in his case, including possible alibi

13

information and names of individuals to contact. *Walford III*, 2019 WL 4745370, at \*2. The public defender followed up on some of this information. *Id.* at \*2; *see id.* at \*3. Petitioner believed one individual should have been subpoenaed by the public defender but was not. *Id.* at \*1. Petitioner "was also concerned that [the] public defender's conversation with [another individual] was not in the presence of an investigator." *Id.*

The Minnesota Court of Appeals also described what Petitioner viewed to be "the beginning of the end of the trust level" with the public defender regarding Petitioner's possible exposure if convicted, noting the trial court sought clarification "if the possible sentence was for all of the pending cases or just this one." *Id.* at \*2; *see id.* at \*3 ("In response to questioning by the state, [Petitioner] testified that, during the period of time in question, he had a matter pending in '[e]very county in the metro area' and represented himself in all of those cases despite a public defender being provided in every case." (second alteration in original)).

The Minnesota Court of Appeals described additional interactions between Petitioner and the public defender concerning other cases:

> [Petitioner] was in custody in Ramsey County between August and September 2016 for a different matter concerning which his public defender from this case was also representing him. [Petitioner] testified that his public defender visited him with an investigator to discuss the cases. [Petitioner] arrived at his November 2016 court date and was surprised that his public defender was not there. [Petitioner] recounted being released in December from Hennepin County to Rice County. Upon being released from Rice County, he was released to Ramsey County for an arson charge. [Petitioner] was told he did not qualify for a public defender when he already had one representing him on two cases, so he contacted his public defender. [Petitioner] testified that he expected that his public

14

defender "would have me put on a docket for the next day or two or whatever and that didn't happen." [Petitioner] testified that he asked his public defender to contact his attorneys about cases in Dakota and Washington Counties, which she did.

*Id.* at *2.

Petitioner's testimony regarding the December meeting was described as follows:

> [Petitioner] testified that his public defender visited him with an investigator while he was in custody for the arson charge and "at that time things blew out of control with her and I." [Petitioner] testified that he "was upset at the time" and "felt like it was the end of the world for me." [Petitioner] testified that he believed nothing was being done on his other two cases by his public defender, and when she "came to see me at the jail in December of 2016, I wasn't happy." [Petitioner] was concerned why it was the second or third time she came to see him with an investigator, and why the public defender had not done additional investigation. According to [Petitioner], his public defender could not explain why she did not give a witness list to the court, and when he asked why she had not investigated his case, she could not answer the question. At that point, [Petitioner] recalled that he put his hand up and said "I'm not talking to you." [Petitioner] admits he was upset, and that his anger may have frightened his public defender. [Petitioner] told the [trial] court that his public defender "packed up all her stuff and said you're not going to treat me that way."

*Id.*

Further, the Minnesota Court of Appeals described Petitioner's testimony that "in light of another order for protection involving his wife, [Petitioner] was scared that his public defender was going to get him charged with terroristic threats" as well as Petitioner's testimony that he "did not talk to his public defender after [the December] meeting." *Id.*

As for the interaction with the supervising attorney on the scheduled trial date in January, the Minnesota Court of Appeals described Petitioner's testimony as follows:

He asked the managing attorney of the public defender at the January 17, 2017 scheduled trial date to tell his public defender that he apologizes for his behavior and that he meant no harm. But he also told the managing attorney that he does not want to get into a situation with his lawyer again. [Petitioner] testified that he told the managing attorney that there was an irreparable breakdown in the relationship and that he did not want to deal with a person to whom he cannot express himself and of whom he was afraid. [Petitioner] asked for a new attorney. The managing attorney told him that this issue would be between him and the judge.

*Id.*

As for additional things Petitioner thought the public defender should have done, the Minnesota Court of Appeals noted Petitioner's testimony "that his public defender should have followed-through on his request to interview his wife and daughter, because they would be able to testify that the complainant was being untruthful about [Petitioner's] wife and daughter being present during the alleged offense." *Id.* at *3. Petitioner also testified "that his public defender 'got involved in too many discussions' and should have given him 'a chance to speak to the investigator man to man.'" *Id.*

Recognizing a criminal defendant's constitutional right to counsel and the state's obligation to provide counsel for indigent defendants, the Minnesota Court of Appeals explained that "an indigent defendant does not have the unbridled right to be represented by the attorney of his choice." *Id.* at *4 (quoting *Worthy*, 583 N.W.2d at 278). The Minnesota Court of Appeals stated:

If the defendant "voices serious allegations of inadequate representation, the district court should conduct a searching inquiry before determining whether the defendant's complaints warrant the appointment of substitute counsel." *State v. Munt*, 831 N.W.2d 569, 586 (Minn. 2013) (quotation omitted). A

16

district court should only appoint substitute counsel for an indigent defendant where "exceptional circumstances exist and the demand is timely and reasonably made." *Id.* (quotation omitted).

"[E]xceptional circumstances are those that affect a court-appointed attorney's ability or competence to represent the client." *State v. Gillam*, 629 N.W.2d 440, 449 (Minn. 2001). What constitutes an exceptional circumstance has not been specifically defined, but a defendant's general dissatisfaction with appointed counsel does not amount to an exceptional circumstance. *E.g.*, *Munt*, 831 N.W.2d at 586; *State v. Fagerstrom*, 176 N.W.2d 261, 264 (Minn. 1970). Nor does personal tension in the attorney-client relationship amount to an exceptional circumstance that would entitle a defendant to substitute counsel. *State v. Voorhees*, 596 N.W.2d 241, 255 (Minn. 1999).

*Id.*

Concluding the trial court's findings were supported by the record, the Minnesota Court of Appeals affirmed. *Walford III*, 2019 WL 4745370, at *4-5. The Minnesota Court of Appeals observed that "[t]he [trial] court characterized the attorney-client relationship here as personal tension and dissatisfaction." *Id.* at *4. Petitioner "argue[d] that his unrebutted testimony at the evidentiary hearing established that there was a breakdown in the attorney-client relationship that affected his public defender's ability to represent him," asserting that she "was still unprepared for trial" more than a year into the representation. *Id.* The appellate court concluded, however, that this characterization "fail[ed] to acknowledge the legitimate continuances that were granted by reason of the public defender's health leave," and the record supported the trial court's finding that there were no exceptional circumstances present. *Id.*

The Minnesota Court of Appeals also concluded Petitioner's "argu[ment] that his

17

public defender was unable to represent him because they met only once to review discovery and discuss the case" was "contrary to [Petitioner's] own testimony at the evidentiary hearing" and "[t]he record d[id] not support [Petitioner's] assertion that his public defender was unwilling to communicate with him." *Id.* at *5. While Petitioner cited the meeting in December 2016 as the point at which "there was a complete breakdown in communication," the appellate court noted that "[t]his meeting took place only a few weeks before the trial" and the record "demonstrate[d] that it was [Petitioner] who made clear that he refused to contact his public defender after the . . . meeting." *Id.*

Lastly, Petitioner pointed out that "his public defender did not appear for the scheduled trial date." *Id.* The Minnesota Court of Appeals noted, however, that Petitioner "conversed for approximately an hour with the managing attorney before trial started and claimed that he was unable to go forward with his public defender because he did not want to speak with her." *Id.*

Affirming the trial court, the Minnesota Court of Appeals agreed with the trial court's findings that "[t]he record . . . reflect[ed] that [Petitioner] was generally dissatisfied with his public defender and . . . there was personal tension between them." *Id.* The Minnesota Court of Appeals concluded that the determination "that this dissatisfaction and tension did not affect [Petitioner's] public defender's ability or competence to represent [him] at trial" was supported by the record and "within [the trial court's] discretion." *Id.*

### 3. Petition for Review

Petitioner subsequently petitioned for review by the Minnesota Supreme Court. Resp't's App. at 35-44. Petitioner identified two legal issues. Resp't's App. at 37. The

first: "Did [Petitioner's] unrebutted testimony at the evidentiary hearing establish there was a complete breakdown in communication between [Petitioner] and his public defender, or, at least a breakdown in the attorney-client relationship that affected the public defender's ability to represent [Petitioner], thus requiring appointment of substitute counsel?" Resp't's App. at 37. The second: "Is a new trial required because [Petitioner's] waiver of counsel was not voluntary, and because [Petitioner] was denied counsel at a critical stage of the prosecution?" Resp't's App. at 37. While the petition for review did not expressly refer to the Sixth Amendment, it did refer to the "constitutional right to counsel" and again cited to *Fagerstrom* and *Gillam*. Resp't's App. at 39-41. The petition for review was denied. Resp't's App. at 45.

### E.  Habeas Petition

Petitioner filed a habeas petition pursuant to 28 U.S.C. § 2254, asserting three grounds for relief based on his Sixth Amendment right to counsel. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); *see also* U.S. Const. amend XIV. Petitioner asserts that (1) the trial court denied him the right to counsel by "forc[ing]" him to represent himself "with . . . advisory counsel, who was not prepared," Pet. at 6; (2) his "waiver of counsel was not voluntary," and he "was denied counsel at a critical stage of the prosecution," Pet. at 8; and (3) his "unrebutted testimony at the evidentiary hearing established there was a complete breakdown in communication between [himself] and [the public defender]," Pet. at 9.

### F.  Motion to Stay & Supplementation of the Record: *Walford Order*

Petitioner previously moved to stay this habeas proceeding so that he could exhaust an unspecified "constitutional issue." *Walford v. Bosch*, No. 20-cv-1637 (SRN/TNL), 2021 WL 252425, at *4-6 (D. Minn. Jan. 25, 2021) [hereinafter *Walford Order*].  This motion was denied because, "[w]ithout some indication as to the claim Petitioner s[ought] to exhaust in state court, there [wa]s simply no basis upon which . . . to conclude that . . ." the limited circumstances contemplated by the Supreme Court in *Rhines v. Weber*, 544 U.S. 269 (2005), were present. *Id.* at *6.  Further, when "viewed collectively, the common theme in Petitioner's grounds for relief and 'legal issues' [wa]s the trial court's handling of the situation with Petitioner's public defender." *Id.*  And, "[b]ecause any previously unraised claim related to the trial court's handling of the situation with Petitioner's public defender [wa]s now barred" under Minnesota's *Knaffla* rule, *see infra* Section III.A.1, "such a claim [wa]s procedurally defaulted" and therefore a stay was not available. *Id.*

In addition to denying Petitioner's motion to stay, the Court also directed Respondent to submit additional materials from the underlying state court proceedings to the extent such materials existed. *Id.*  Those materials have been provided to the Court.

### III. ANALYSIS

A state prisoner may seek a writ of habeas corpus in federal court "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits habeas review to adjudications that:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quotation and citation omitted). Absent a claim that falls within the parameters of 28 U.S.C. § 2254(d), a habeas corpus petition will not prevail.

## A. Procedurally Defaulted Claims: Grounds 1 & 2

Respondent argues that Grounds 1 and 2 are procedurally defaulted.

### 1. Principles of Exhaustion & Procedural Default

In order for habeas relief to be granted, a state prisoner first must show that he "has exhausted the remedies available" in the state courts. 28 U.S.C. § 2254(b)(1)(A); *see, e.g.*, *Armstrong v. Iowa*, 418 F.3d 924, 925 (8th Cir. 2005). To satisfy this exhaustion requirement, the state prisoner "must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review)" in a manner that alerts the court to the claim's federal nature and gives "the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations and quotations omitted); *accord O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to

resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

"A petitioner must present *both* the *factual and legal* premises of his claims to the state courts in order to exhaust the claims properly." *Dansby v. Hobbs*, 766 F.3d 809, 823 (8th Cir. 2014) (quotation omitted); *accord Anderson v. Groose*, 106 F.3d 242, 245 (8th Cir. 1997). "The onus rests on the prisoner to present the substance of his federal claims in each appropriate state court . . . ." *Turnage v. Fabian*, 606 F.3d 933, 936 (8th Cir. 2010) (quotation omitted).

A claim is unexhausted if state law allows the petitioner to raise the claim by any available state court procedure. *See* 28 U.S.C. § 2254(c). But, if a petitioner has not fairly presented his claim in state court *and* a state procedural rule precludes further litigation of the claim, that claim is procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Abdullah v. Groose*, 75 F.3d 408, 411 (8th Cir. 1996) ("If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now."). In Minnesota, "where direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief." *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976). Thus, Minnesota law provides a procedural rule that denies further litigation of a claim that could have been raised on direct appeal. *Murphy v. King*, 652 F.3d 845, 849-50 (8th Cir. 2011). This rule "bars not only claims that were known at the time of direct appeal, but also claims that *should have* been known." *Sontoya v. State*, 829 N.W.2d 602, 604 (Minn. 2013) (citing *Knaffla*, 243 N.W.2d at 741).

Additionally, this procedural rule applies to claims that could have been raised in an earlier petition for postconviction relief. "[I]f . . . a claim could have been raised in a previous postconviction petition, the *Knaffla* rule bars consideration of the claim in a subsequent petition for postconviction relief." *Pearson v. State*, 891 N.W.2d 590, 597 (Minn. 2017); *accord Crow v. State*, 923 N.W.2d 2, 9 (Minn. 2019).

### 2. Ground 1: Forced to Proceed with Unprepared Advisory Counsel

In Ground 1, Petitioner asserts that he was denied his Sixth Amendment right to counsel because he "was force[d] to go pro[] se with . . . advisory counsel, who was not prepared." Pet. at 6. As best as this Court is able to tell, the thrust of Ground 1 concerns the timing of the appointment of advisory counsel as well as counsel's preparedness. Petitioner argues that the "belated appointment of advisor[y] counsel after [Petitioner's] trial had begun"[3] was inconsistent with his right to counsel under the Sixth Amendment because advisory counsel "candidly admitted he was unprepared for trial because the [trial] court's previous order appointing him . . . specified that he was not required to be prepared to assume full representation." Pet'r's Br. at 28, ECF No. 7.[4] Petitioner additionally argues

---

[3] This same characterization was made by Petitioner's appellate counsel in *Walford II*. Resp't's App. at 93. Based on the record before the Court, advisory counsel was appointed more than two weeks before trial. *Compare* Resp't's App. at 68-39 *with* Resp't's App. at 75-76; *see also* Resp't's App. at 10-11, 37-38. It seems that this argument is derived from Petitioner's subsequent decision on the day of trial to have advisory counsel assume full representation. Resp't's App. at 82-86. After Petitioner had waived his right to a jury trial, motions in limine had been argued, the parties had made their opening statements, and the state's first witness had been called, Petitioner told the trial court that he was "going to take the option that you gave me when you gave me [advisory counsel]. At this point, I think I'm going to have to go with him to represent me." Resp't's App. at 83. After further inquiry of Petitioner and advisory counsel and discussion about the capacity in which advisory counsel had been appointed, Petitioner "affirmed that he wanted [advisory counsel] to assume representation, and [advisory counsel] did so." Resp't's App. at 83-85.

[4] As the Court previously noted, "[t]he[] 'legal issues' [identified in Petitioner's memorandum in support of his motion to stay] largely overlap with [his] grounds for habeas relief and . . . appear to be arguments in support of the Petition itself." *Walford Order*, 2021 WL 252425, at *6. The Court has liberally construed Petitioner's filings in light of his pro se status. *See, e.g.*, *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004).

that advisory counsel "acknowledged he would have prepared the case differently and was hampered by decisions [Petitioner] had made while representing himself." Pet'r's Br. at 29.

Ground 1 was raised, nearly word for word, to the Minnesota Court of Appeals in both *Walford II* and *III*. Resp't's App. at 33 (*Walford II*), 93 (*Walford III*). As such, the record shows that this Ground 1 was fairly presented to the Minnesota Court of Appeals.

But, in order for a claim to be appropriate for federal habeas review, the petitioner must have presented the claim to *each* appropriate state court, including the state supreme court with powers of discretionary review. *Baldwin*, 541 U.S. at 29. Thus, "[w]hen a state has two tiers of appellate review, a petitioner must raise his federal claims to both levels before presenting his claims in a federal habeas petition." *Krieger v. Minnesota*, No. 13-cv-1942 (JRT/HB), 2014 WL 7771777, at *3 (D. Minn. Aug. 5, 2014) (citing *O'Sullivan*, 526 U.S. at 845), *report and recommendation adopted*, 2015 WL 470811 (D. Minn. Feb. 4, 2015).

While Petitioner fairly presented—twice—Ground 1 to the Minnesota Court of Appeals, Petitioner failed to present Ground 1 to the Minnesota Supreme Court in his petition for review. As such, Petitioner did not fairly present Ground 1 to all applicable Minnesota courts before seeking federal habeas relief. *See, e.g.*, *Lynch v. Miles*, No. 17-cv-1917 (DWF/TNL), 2018 WL 1385898, at *8-9 (D. Minn. Jan. 30, 2018), *report and recommendation adopted*, 2018 WL 1383838 (D. Minn. Mar. 19, 2018); *Krieger*, 2014 WL 7771777, at *5. Moreover, as this Court previously noted in connection with Petitioner's motion to stay, claims related to the appointment of advisory counsel would

have been known to Petitioner at the time of his first appeal or should have been known to him at that time. Thus, Minnesota's *Knaffla* rule bars Petitioner from pursuing Ground 1 in a petition for postconviction relief, and Petitioner has not argued that Ground 1 falls within any exception to *Knaffla*. *See Sontoya*, 829 N.W.2d at 604; *see also Murphy*, 652 F.3d at 850. Accordingly, Ground 1 is procedurally defaulted.

Procedurally defaulted claims are generally barred from federal habeas review. *Coleman*, 501 U.S. at 750; *accord Morgan v. Javois*, 744 F.3d 535, 538 (8th Cir. 2013) ("[T]he procedural bar under state law prevents federal habeas review of [the petitioner's] federal claims unless he can demonstrate cause and prejudice or a miscarriage of justice."). The merits of a procedurally barred claim will be addressed by a federal court only when one of two narrow exceptions applies: (1) where the state "prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) where the state prisoner can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also McCall v. Benson*, 114 F.3d 754, 758 (8th Cir. 1997). If neither of these exceptions applies, the merits of a procedurally defaulted claim will not be entertained by a federal court. *See, e.g.*, *Murphy*, 652 F.3d at 850 (declining to excuse petitioner's procedurally defaulted claims for failure to establish either exception). Petitioner has made "no attempt to meet th[e]se standards." *Morgan*, 744 F.3d at 539. Therefore, Ground 1 must be summarily denied. *See id.*; *accord Stephen v. Smith*, 963 F.3d 795, 800 (8th Cir. 2020).

### 3. Ground 2: Voluntariness of Waiver & Denial of Counsel at Critical Stage

In Ground 2, Petitioner asserts that he was denied his Sixth Amendment right to counsel because he did not voluntarily waive this right and "was denied counsel at a critical stage of the prosecution." Pet. at 8; *see also* Pet'r's Br. at 22, 27-29. Respondent contends that Ground 2 was "clearly not presented as [a] *federal* claim[] in his petition for review to the Minnesota Supreme Court." Resp't's Mem. at 7, ECF No. 9.

"In order to fairly present a claim, a petitioner is required to refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." *Nash v. Russell*, 807 F.3d 892, 898 (8th Cir. 2015) (quotation omitted); *accord Turnage*, 606 F.3d at 936; *McCall*, 114 F.3d at 757. Respondent contends that "[P]etitioner did not refer to *any* federal constitutional right, or a federal constitutional case, or a state case raising a pertinent federal constitutional issue" in his petition for review. Resp't's Mem. at 7.

In his appeals in *Walford II* and *III*, Petitioner expressly referred to his right to assistance of counsel under the federal Constitution. Petitioner specifically cited federal constitutional case law regarding the attachment of the Sixth Amendment right to counsel at critical stages of a criminal prosecution, such as *Wade*, *Rothgery*, and *Hanson*. Additionally, Petitioner cited federal constitutional case law regarding the waiver of this right, including *Pazden* and *Gilbert*. Fair presentation to the Minnesota Court of Appeals alone, however, is not enough for federal habeas review.

Although Petitioner identified whether a new trial was required because his waiver

of counsel was not voluntary and he was denied counsel at a critical stage of the prosecution as a legal issue in his petition for review, it cannot be said that he fairly presented Ground 2's "critical stage" and "voluntariness" claims to the Minnesota Supreme Court. Unlike his prior appeals which expressly referenced a Sixth Amendment right to counsel under the federal Constitution, Petitioner relied more generically on a "constitutional right to counsel" in his petition for review. Whereas in his prior appeals Petitioner expressly cited federal constitutional case law in discussing the attachment of the Sixth Amendment right to counsel at critical stages of a prosecution and in evaluating the voluntariness of a waiver of that right, Petitioner did not cite to these authorities in his petition for review. *See Turnage*, 606 F.3d at 940. Rather, Petitioner's arguments centered on state case law— primarily *Gillam* and, to a lesser extent, *Fagerstrom* and *State v. Clark*, 722 N.W.2d 460 (Minn. 2006).

Only *Fagerstrom* touched on the attachment of the Sixth Amendment's right to counsel "at every stage of the criminal process," citing *Wade* in support, and then only in passing. 176 N.W.2d at 264. In *Fagerstrom*, "[c]ounsel was appointed for [the] defendant almost a year prior to trial." *Id.* at 265. Appointed "counsel made an appearance with [the] defendant to waive preliminary hearing, and a second appearance was made at the arraignment. Two weeks prior to trial, [appointed counsel] made certain motions on behalf of [the] defendant." *Id.* On the day of trial, the "defendant expressed a desire for a different attorney and requested a continuance in order to allow him to obtain counsel through the Bureau of Indian Affairs, or, if none were available, another public defender to represent him." *Id.* at 263. These requests were denied. *Id.* Among others, the issue before the

Minnesota Supreme Court was whether the defendant was "denied his constitutional right to counsel when the trial court refused to grant his request for a continuance to permit him to engage another attorney to represent him." *Id.* at 264. The Minnesota Supreme Court concluded that the trial court did not err by denying the continuance. *Id.* at 264-65. Reference to *Fagerstrom* did not fairly present Ground 2's claim that Petitioner was denied the right to counsel during critical stages of the prosecution.

Similarly, the pertinent issue in *Gillam* and *Clark* was the appointment of substitute counsel, not the voluntariness of any waiver. *See Clark*, 722 N.W.2d at 464-65; *Gillam*, 629 N.W.2d at 448-50. Thus, neither of these cases fairly presented Ground 2's claim that Petitioner's waiver of his right to counsel was not voluntary.

In sum, like Ground 1, Petitioner did not fairly present Ground 2 to all applicable Minnesota courts before seeking federal habeas relief. *See, e.g.*, *Lynch*, 2018 WL 1385898, at *8-9; *Krieger*, 2014 WL 7771777, at *5. And, like Ground 1, claims related to the attachment of his Sixth Amendment right to counsel during critical stages of his prosecution and trial as well as the voluntariness of his waiver of counsel would have been and in fact were known to Petitioner at the time of his first appeal. Accordingly, Minnesota's *Knaffla* rule likewise bars Petitioner from pursuing Ground 2 in a petition for postconviction relief, and Petitioner has not argued that Ground 2 falls within any exception to *Knaffla*. *See Sontoya*, 829 N.W.2d at 604; *see also Murphy*, 652 F.3d at 850. Therefore, Ground 2 is also procedurally defaulted. And, as Petitioner has made no attempt to show that either the cause-and-prejudice or fundamental-miscarriage-of-justice exceptions apply, Ground 2 must also be summarily denied. *See Morgan*, 744 F.3d at 539;

*accord Stephen*, 963 F.3d at 800.

## B. Remaining Claim: Ground 3

Ground 3 asserts a violation of the Sixth Amendment right to counsel by challenging the trial court's findings on whether the appointment of substitute counsel was required, i.e., whether there had been an irreparable breakdown in the attorney-client relationship between Petitioner and his public defender that affected the public defender's ability[5] to represent Petitioner.

### 1. AEDPA

As stated above, AEDPA limits habeas review to adjudications that:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Stephen*, 963 F.3d at 799 (AEDPA "provides two avenues for habeas relief"). As best as this Court is able to tell, Petitioner has not claimed a decision of the Minnesota courts was contrary to or involved an unreasonable application of clearly established federal law. Accordingly, the Court focuses on § 2254(d)(2).

"[H]abeas relief can be available if the conviction at issue is based on findings of

---

[5] Although at times phrased in terms of "ability or competence to represent [Petitioner]," *Walford III*, 2019 WL 4745370, at *1; *see also* Resp't's App. at 101-02, the record reflects that the issue was one of ability not competence, *see, e.g.*, *Walford III*, 2019 WL 4745370, at *4 ("[Petitioner] expressly disclaims any argument concerning the public defender's competence."); Resp't's App. at 24 ("As an initial matter, it bears emphasizing that [Petitioner] is not alleging there existed circumstances that affect [the public defender's] *competence* to represent him."); *see also* Resp't's App. at 162-63 (focusing on "ability prong").

fact that could not reasonably be derived from the state court evidentiary record." *Barnes v. Hammer*, 765 F.3d 810, 814 (8th Cir. 2014); *accord Ervin v. Bowersox*, 892 F.3d 979, 985 (8th Cir. 2018). "AEDPA requires [, however, that federal courts] give 'the state trial court substantial deference' in this area." *Stephen*, 963 F.3d at 800 (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)). "[A] federal court is bound by the state court's factual findings unless the state court made a 'decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Cole v. Roper*, 783 F.3d 707, 711 (8th Cir. 2015) (quoting 28 U.S.C. § 2254(d)(2)). "Factual determinations made by state courts are presumed correct and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence." *Id.*; *see also* 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (AEDPA "requires federal habeas courts to presume the correctness of state courts' factual findings").

AEDPA's "standard is difficult to meet." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was *unreasonable* – a substantially higher threshold." *Boss v. Ludwick*, 760 F.3d 805, 810 (8th Cir. 2014) (emphasis added) (quoting *Landrigan*, 550 U.S. at 473). "The term 'unreasonable' refers not to ordinary error or even to circumstances where the petitioner offers a strong case for relief, but to extreme malfunctions in the state criminal justice system." *Mays*, 141 S. Ct. at 1149 (quotation omitted); *see also Harrington*, 562 U.S. at 102-03. "A factual

determination is not unreasonable 'merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Cole*, 783 F.3d at 711 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see also Brumfield*, 576 U.S. at 313-14. "The existence of some contrary evidence in the record does not suffice to show that the state court's factual determination was unreasonable." *Cole*, 783 F.3d at 711 (citing *Wood*, 558 U.S. at 302-03). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Brumfield*, 576 U.S. at 314 (quotation omitted).

### 2.  Merits

"The Sixth Amendment, applicable to the States by the terms of the Fourteenth Amendment, provides that the accused shall have the assistance of counsel in all criminal prosecutions." *Missouri v. Frye*, 566 U.S. 134, 138 (2012); *see also* U.S. Const. amend VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."). For a criminal defendant who does not require appointed counsel, "an element of this right is the right . . . to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *accord Daniels v. Kelley*, 881 F.3d 607, 611 (8th Cir. 2018). But, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151. Accordingly, although a defendant is generally "entitled to his choice of counsel, . . . 'the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'" *Chavez-Nelson v. Dayton*, No. 17-cv-4098 (PJS/SER), 2018

WL 7133725, at *6 (D. Minn. Aug. 2, 2018) (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)), *report and recommendation adopted sub nom. Chavez-Nelson v. Walz*, 2019 WL 332200 (D. Minn. Jan. 25, 2019).

Petitioner asserts the determination that no irreparable breakdown in the attorney-client relationship affecting the public defender's ability to represent him had occurred, i.e., there were no exceptional circumstances warranting the appointment of substitute counsel, was unreasonable based on the record at the evidentiary hearing. Petitioner points to his "unrebutted testimony at the evidentiary hearing [as] establish[ing] there was a complete breakdown in communication" with his public defender. Pet. at 9. Petitioner also points to: (1) his public defender "request[ing] continuance after continuance either because she was not prepared or she was on medical leave," Pet. at 9; (2) the public defender walking out of the December meeting when Petitioner asked what she had done to investigate his innocence; and, relatedly, (3) the trial court erroneously finding that, during the meeting, Petitioner had put up his hand and indicated to his public defender that "he would no longer speak to her," Pet'r's Br. at 16 (quotation omitted).

As explained by the Minnesota Court of Appeals,

> "[E]xceptional circumstances are those that affect a court-appointed attorney's ability or competence to represent the client." *State v. Gillam*, 629 N.W.2d 440, 449 (Minn. 2001). What constitutes an exceptional circumstance has not been specifically defined, but a defendant's general dissatisfaction with appointed counsel does not amount to an exceptional circumstance. *E.g.*, *Munt*, 831 N.W.2d at 586; *State v. Fagerstrom*, 176 N.W.2d 261, 264 (Minn. 1970). Nor does personal tension in the attorney-client relationship amount to an exceptional circumstance that would entitle a defendant to substitute counsel. *State v. Voorhees*, 596 N.W.2d 241, 255

32

(Minn. 1999).

*Walford III*, 2019 WL 4745370, at *4.

Petitioner would essentially have this Court review *de novo* whether the circumstances with the public defender constituted exceptional circumstances affecting the public defender's ability to represent him. But, a federal habeas court is not allowed to conduct its own *de novo* review. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter.") The question for this Court is whether the Minnesota courts made an unreasonable determination of fact in light of the evidence presented in the state court proceedings. More specifically, in the context of this case, the question is whether the finding that the circumstances between Petitioner and the public defender amounted to personal tension and dissatisfaction with the attorney-client relationship rather than exceptional circumstances affecting the public defender's ability to represent Petitioner "could not be reasonably derived from the state court evidentiary record." *Barnes*, 765 F.3d at 814; *accord Ervin*, 892 F.3d at 985.

It was not unreasonable to conclude based on the record at the evidentiary hearing that the circumstances between Petitioner and the public defender amounted to personal tension and dissatisfaction with the attorney-client relationship rather than exceptional circumstances affecting the public defender's ability to represent Petitioner. Like his second appeal in *Walford III*, Petitioner again points to the number of continuances as evidencing a lack of preparation by the public defender. *See* 2019 WL 4745370, at *4. But, as Respondent points out, the Minnesota Court of Appeals held that the

33

characterization of the public defender as being unprepared "fail[ed] to acknowledge the legitimate continuances that were granted by reason of the public defender's health leave." *Id.* While Petitioner appears to disagree with this conclusion, Petitioner has not identified any evidence—let alone clear and convincing evidence—indicating the Minnesota courts unreasonably erred regarding the nature of the continuances or any effect they had on the public defender's ability to represent him. *See* 28 U.S.C. § 2254(e)(1); *Stephen*, 963 F.3d at 800; *Boss*, 760 F.3d at 811.

Similarly, as in *Walford III*, Petitioner asserts that there was a complete breakdown in communication at the December meeting. During the evidentiary hearing, Petitioner testified that, after not getting answers from the public defender regarding the investigation of his case, he turned to the investigator and inquired what had been done on the case. When the public defender started to answer for the investigator, Petitioner put up his hand and said that he was not talking to the public defender. The public defender then "packed up all her stuff," told Petitioner he was "not going to treat [her] that way," and left. Resp't's App. at 134-35; *see* Resp't's App. at 136-37. Following this testimony, as aptly described by Petitioner, the trial court "paraphrased [Petitioner's] testimony back to him," Pet'r's Br. at 16, asking if he had told the public defender that he was not going to talk to her. *See* Resp't's App. at 136. Petitioner responded, "No, I never told her that." Resp't's App. at 136. Petitioner later testified, however, that he "never contacted [the public defender] after that day." Resp't's App. at 138.

Citing to the follow-up questioning by the trial court, Petitioner asserts that the trial court erroneously found that he told the public defender that he was no longer going to talk

to her. Pet'r's Br. at 16. But, in the oral findings on the record, the trial court found that, while Petitioner "put his hand up to indicate that he would no longer speak to [the public defender]" during the December meeting, which caused the public defender to leave, Petitioner had since clarified "that that meant just for that moment." Resp't's App. at 176. Thus, the trial court appears to have appreciated the very distinction Petitioner was trying to make.

In any event, even assuming the trial court erred by taking Petitioner's hand gesture and statement at the December meeting out of context, Petitioner has not met his burden to overcome the presumption of correctness accorded to the finding that there had not been a complete breakdown in communication. Although the public defender terminated the meeting after this exchange, the trial court noted that the evidence did not indicate that the public defender would no longer speak with Petitioner or take his calls. Petitioner has not presented any evidence to the contrary. *See Cole*, 783 F.3d at 711. Moreover, Petitioner himself testified that he did not reach out to the public defender after that meeting. Based on the record before the Court, and having reviewed the entirety of the transcript of the evidentiary hearing, it cannot be said the finding that the public defender was not unwilling to communicate with Petitioner was unreasonable in light of the evidence presented, regardless of how Petitioner characterizes his own testimony. *See Ervin*, 892 F.3d at 985; *see also Stephen*, 863 F.3d at 800; *Boss*, 760 F.3d at 811.

In sum, it was not unreasonable for the Minnesota courts to conclude that, collectively, the circumstances with Petitioner's public defender amounted to personal tension and dissatisfaction rather that exceptional circumstances affecting the public

defender's ability to represent Petitioner that would warrant the appointment of substitute counsel.

## IV. CERTIFICATE OF APPEALABILITY

A habeas corpus petitioner filing a petition under 28 U.S.C. § 2254 cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A Certificate of Appealability may be granted only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  In order to do so, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, it is highly unlikely that any other court would treat Petitioner's claims for relief differently than they are being treated here.  Petitioner has not identified (and this Court cannot discern) anything novel, noteworthy, or worrisome about this case that warrants appellate review.  It is therefore recommended that Petitioner should not be granted a Certificate of Appealability in this matter.

[Continued on next page.]

# V. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Petitioner's Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, ECF No. 1, be **DENIED**.

2. This action be **DISMISSED WITH PREJUDICE**.

3. Petitioner should **NOT** be granted a Certificate of Appealability.


Date: July____2____, 2021                              _s/ Tony N. Leung_____
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       District of Minnesota


                                                       _Walford v. Bosch_
                                                       Case No. 20-cv-1637 (SRN/TNL)


## <u>NOTICE</u>

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).